IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| MARY POTTORF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-0246-CV-W-NKL |
| | ) | |
| CITY OF LIBERTY, MO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Mary Denise Pottorf, a former police dispatcher for the Liberty Police Department, brings this 42 U.S.C. § 1983 action against Craig L. Knouse, in his individual and official capacity as police chief, and the City of Liberty, Missouri (collectively "defendants"), alleging she was fired in retaliation for making certain statements protected under the First Amendment. Defendants assert Pottorf is ineligible for constitutional protection because she was neither speaking as a citizen when she made her statements, nor were her statements on an issue of public concern. Defendants also deny she was terminated in retaliation because they had substantial evidence that her statements were false. Finally, Defendants claim Knouse is protected under qualified immunity and that Pottorf has failed to show evidence of municipal liability. Defendants move for summary judgment [Doc. # 26], which this Court now grants.

**I.     Factual Background**

1

## A. Professional Standards Investigations

The Liberty Police Department (the Department) serves, and is an operation of the City of Liberty, Missouri, a municipal corporation. The Department, headed by the police chief, employs dozens of commissioned police officers, as well as citizens who are not commissioned police officers. In 1995, Pottorf, as a citizen, began working as a part-time dispatcher for the Department and was promoted to full-time in 1996. As a dispatcher, she answered telephone calls requesting police service. She also answered the police radio, dispatched police officers for service, and ran license plates for Liberty police officers. The Department's written policy outlining a communication officer's essential duties and responsibilities does not specifically include giving statements or participating in internal affairs investigations; however, the policy also states that "[s]pecifications are not intended to reflect all duties performed within the job." Dispatchers are considered part of the Department's Communications Division. Pottorf reported to Sheila Costanza, the Communications Supervisor.

Knouse has been police chief since January 2002. Prior to that, he led the Kansas City, Missouri Police Department's "Professional Standards Division," which handles all internal affairs investigations. After taking over as Liberty Police Chief, Knouse initiated "Professional Standards investigations"—also known as internal affairs investigations—to ensure that the Department's employees followed appropriate procedures. Professional Standards investigations are often initiated by a complaint against, or an allegation of misconduct by, a police officer. Statements are often taken in these investigations, and an

2

employee's failure to give a statement, after being requested to do so, is a direct violation of the Department's policy, potentially resulting in termination. The purpose of these investigations is to determine if a police officer has violated the Department's policy or procedure.

Information gathered during a Professional Standards investigation is considered confidential. Employees are informed before giving statements for these investigations that if they discuss or speak to others not involved in the investigation about the matters being looked into, they are subject to discipline up to, and including, termination. Confidentiality in Professional Standards investigations is necessary to protect the privacy of the complaining person and witness, as well as the individual being investigated. Additionally, the guarantee of confidentiality encourages people to come forward with complaints and information.

**B.    Investigation into Pottorf's Allegation of Police Brutality**

On August 24, 2004, Lieutenant Duane Davidson had an argument with Sergeant James Wright, resulting in Wright forwarding a written complaint to Major James Simpson. Police Chief Knouse then assigned Lieutenant Mark Balzer to perform a Professional Standards investigation into the incident. As part of his investigation, Balzer issued a "Notice of Intent to Take Statement" in Pottorf's mailbox at the Department on August 30, 2004. The notice explained that Pottorf was to give a statement and that she could be terminated if she discussed the investigation with anyone but Balzer.

On September 30, 2004, Balzer conducted his interview with Pottorf. Before giving

3

her statement, Pottorf signed a document that stated she understood that her statement was to be used for the "sole and exclusive purpose of a professional standard investigation." The document also stated that Pottorf was compelled "to give this statement at [Balzer's] order as a condition of employment." During the interview, Balzer inquired if Pottorf ever witnessed Davidson exhibit aggressive tendencies. At this point, Pottorf asked if she was required to answer the question. After she was told yes, she stated that approximately seven to eight years earlier, she witnessed Davidson kick a specific prisoner in the head several times. Pottorf remembered the name of the prisoner. She said she believed Bill Darrah was one of the officers present during the incident. Pottorf also said that on a different occasion she witnessed Davidson strike another officer in the chest with a pointed finger. That officer later denied in an interview that anything happened.

Although the alleged incident between Davidson and the prisoner occurred almost eight years ago, Pottorf did not recall ever talking about it until her interview with Balzer, and then only because she was asked. Because of the confidential nature of the investigation, Pottorf believed Davidson would not be asked about her statement; however, she was never actually given such an assurance because it is the Department's practice to tell those accused of wrongdoing the nature of the charge against them, allowing them to respond. Pottorf's statement was recorded and transcribed, which Pottorf then read and signed.

On October 29, 2004, Balzer issued a nine-page confidential memorandum to Major Simpson, outlining the investigation into the incident between Davidson and Wright. The memorandum also included Pottorf's allegation that Davidson once kicked a prisoner in the

4

head. On December 2, 2004, Simpson issued a three-page confidential memorandum to Police Chief Knouse regarding the Professional Standards investigation into the incident between Davidson and Wright. Simpson's memorandum recommended that Pottorf's allegation of police brutality be further investigated. Davidson was disciplined as a result of his confrontation with Wright.

After completion of the initial investigation, Police Chief Knouse asked Balzer to investigate Pottorf's claim that Davidson had kicked a prisoner in the face almost eight years earlier. On December 9, 2004, Balzer interviewed Bill Darrah, who stated that he never witnessed Davidson attack a prisoner. Balzer also checked police records and determined that the prisoner involved had been arrested for driving while intoxicated by Davidson on September 4, 1998. There were no other arrests involving this specific prisoner and Davidson; thus, Balzer conclusively determined that the September 4, 1998 arrest was the one referred to by Pottorf in her September 30, 2004 statement.

The Alcohol Influence Report from the September 4, 1998 arrest indicated that the prisoner had a "strong" odor of alcoholic beverage on him and a blood alcohol level of .194%. The report also states that the prisoner was swaying, wobbling, stumbling and confused. Davidson recalled that the prisoner "appeared very intoxicated" and "was unstable on his feet." Additionally, Davidson recalled that the prisoner became agitated when the officers attempted to take a Polaroid picture and that a scuffle ensued. Attempting to restrain the prisoner in order to take the picture, Davidson "grabbed him by the face" as the prisoner was coming forward and pushed him back down in the chair. The prisoner got out of the

5

chair again, and again the officers, including Davidson, pushed him back down. At some point, because the plastic chairs used by the Department "have a tendency to be a little tipsy," Davidson, Officer John Rutz and the prisoner fell to the floor where Davidson attempted to handcuff the prisoner.

Continuing his investigation, Balzer next searched for the VHS tape recording of the prisoner's arrest, but discovered it had been destroyed sometime in 2002 after the case was completed in municipal court. This was part of the Department's routine policy to destroy videotapes of DUI arrests after the criminal case is disposed. The police records also indicated that Officer John Rutz assisted Davidson during the September 4, 1998 arrest. In his interview with Balzer, Rutz explained he was "absolutely certain" Davidson did not kick the prisoner in the face.

On December 16, 2004, Balzer interviewed the (now former) prisoner. At the beginning of the videotaped interview, Balzer stated:

> Just to set the record straight before we begin, I want to mention here that I have spoken to [the (former) prisoner] prior to going on tape. I thanked him for his cooperation in this investigation; I had advised him that I would be more than happy to convey to the Municipal Court for the City of Liberty the fact that he was cooperative in this investigation and she can make a notation in his court file. Other than that, no promises or guarantees have been made.

The former prisoner claimed he remembered the incident. He explained he had refused to let the officers take a Polaroid photograph of him and had to be held down by the arresting officers in order for the picture to be taken. However, the prisoner stated he was never kicked or assaulted by any officer at any time.

6

On January 7, 2005, Balzer interviewed Davidson about the prisoner abuse allegations. Davidson said Officer Rutz helped him in the arrest, and that he never kicked or assaulted any prisoner. Davidson then stated that there was no action by him that could have been construed as him kicking the prisoner in the head. On January 12, 2005, Pottorf was interviewed again regarding her allegations against Davidson, and again she stood by her claims. On January 13, 2005, Balzer issued an eight-page memorandum to Police Chief Knouse regarding Pottorf's allegation, finding that the prisoner said he was never kicked, that Officer Rutz said he never witnessed Davidson kick the prisoner, and that Davidson denied kicking the prisoner. Finally, a photograph of the prisoner from the day of his arrest showed no injuries or marks on his face. Thus, Balzer's memorandum concluded that Pottorf's claim could not be substantiated.

On January 22, 2005, Pottorf was given a polygraph examination regarding her allegation against Davidson. In the opinion of the examiner, the polygraph showed that Pottorf was not being truthful when asked whether she denied fabricating the incident. Despite the results of the polygraph and the conclusions of Balzer's investigation, Pottorf continues to maintain she is telling the truth. Pottorf also believes the polygraph was not given correctly and that the questions asked were vague, resulting in different readings. Aside from her own deposition testimony, Pottorf cites no support for these claims.

### C.    Pottorf's Problems with Coworkers

During the timeframe that Balzer was conducting his original Professional Standards investigation in 2004, Pottorf began having problems with Davidson, to the point of being

7

routine. Davidson and other officers on his shift made complaints to Sheila Costanza, Pottorf's supervisor, regarding her work performance. Pottorf maintains these complaints were unfounded. When Police Chief Knouse was informed that Pottorf was having problems with Davidson and his shift, he asked Captain Dave Tedesco to try solve the situation because it is not uncommon for dispatchers to have problems with police officers.

Unfortunately, problems continued and in late October 2004, Costanza threatened to discipline Pottorf. On October 25, 2004, Pottorf provided Costanza with a memorandum responding to Davidson's complaints (which she believed were unfounded). Pottorf stated she did not recall having any problems with Davidson before 2004 and did not know why he was complaining now. On October 27, 2004, Pottorf met for approximately 30 minutes with Costanza and Captain Tedesco to discuss her problems with Davidson. Pottorf states she was reassured during the meeting that Davidson was willing to modify his behavior; they asked that she do the same.

On November 23, 2004, Patrol Officer Heather Massey sent a two-page memorandum to Costanza explaining she had a verbal disagreement with Pottorf. Massey believed that Pottorf was angry over some complaints she made regarding safety issues and Pottorf. On November 24, 2004, Police Officer Arnold sent a two-page memorandum to Costanza explaining various problems he was having with Pottorf. On November 29, 2004, Pottorf met with Captain Tedesco, Costanza and Police Secretary Bonnie Allen. At this meeting, Costanza claimed that Pottorf had misused the Department's paging system by using it for personal use. Pottorf admitted the allegations against her and accepted a verbal warning.

8

Additionally, Pottorf was told she had acted unprofessional in a conversation with Police Officer Steve Smith. Pottorf admitted the conversation could have been construed as unprofessional.

### D. Intern Complains About Pottorf

Steffnee Harris, a student at Park University, interned with the Department during December 2004 and January 2005. On January 6, 2005, Steffnee submitted a one-page, typewritten complaint to the Department claiming Pottorf had caused her fiancé to break their engagement. That same day, Captain Tedesco recommended an investigation into the complaint to Police Chief Knouse. The investigation began immediately and several people were interviewed.

On January 10, 2005, Blazer summoned Pottorf to give a statement. Although she appeared, she refused to answer questions about the specifics of a January 3, 2005, telephone conversation she had with Steve Harris, Steffnee's fiancé. Later that same day, Captain Tedesco summoned Pottorf to his office, ordering her to answer all of Blazer's questions. Pottorf still refused. As a result, she was suspended. On January 12, 2005, Pottorf agreed to answer Blazer's questions and returned to the Department. She was ordered not to discuss the investigation with anyone else. Because she agreed to answer the question, Pottorf's suspension was lifted that same day.

The investigation determined that Steffnee's complaint was unsubstantiated "as presented." But, it did reveal Pottorf committed several other violations of the Department's policy, including: using city-owned equipment for personal reasons, insubordination by

9

refusing to answer questions in an official internal investigation, and discussing the investigation with another party involved despite an order to the contrary. Police Chief Knouse believed Pottorf's discussion of the investigation was her most serious offense.

### E.    Pottorf Is Fired

In his deposition testimony, Police Chief Knouse stated, "Mary Pottorf was one of the best dispatchers behind the console that I think I've ever seen, and I would say that in particular in high-stress situations." But, having reviewed the Professional Standards investigation involving Pottorf's claims of alleged policy brutality by Davidson, as well as the investigation into Pottorf's conduct with Steffnee Harris, Police Chief Knouse recommended to the City Administrator that she be terminated. This recommendation was based on evidence that Pottorf had made serious false allegations against Davidson. Additionally, Knouse considered the violations cited in Blazer's report regarding Steffnee's complaint and other disciplinary action taken against Pottorf in October and November 2004. On February 2, 2005, the Liberty City Administrator approved Pottorf's termination.

## II.    Discussion

### A.    Summary Judgment Standard

Fed. R. Civ. P. 56(c) requires "the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden on the party moving for summary judgment "is only to demonstrate . . . that the record does not disclose a genuine dispute on a material

10

fact." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-Op.*, 838 F.2d 268, 273 (8th Cir. 1988).

Once the moving party has done so, the burden shifts to the nonmoving party to go beyond his pleadings and show, by affidavit or by "depositions, answers to interrogatories, and admissions on file," that there is a genuine issue of fact to be resolved at trial. *Celotex*, 477 U.S. at 323. Evidence of a disputed factual issue which is merely colorable or not significantly probative, however, will not prevent entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, because "[a]ll facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the opposing party," Local Rule 56.1(a), the opposing party's mere allegation that issues remain in dispute, without adequate references to the record, is insufficient and the facts will be deemed admitted. *See Ruby v. Springfield R-12 Pub. Sch. Dist.*, 76 F.3d 909, 911 n.6 (8th Cir. 1996).

Summary judgment, however, "is an extreme remedy, to be granted only if no genuine issue exists as to any material fact." *Hass v. Weiner*, 765 F.2d 123, 124 (8th Cir. 1985). In ruling on a motion for summary judgment, this court must view all facts in a light most favorable to the nonmoving party, and that party must receive the benefit of all reasonable inferences drawn from the facts. *See Robinson v. Monaghan*, 864 F.2d 622, 624 (8th Cir. 1989).

If "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," the court must grant summary judgment. Fed. R. Civ. P.

11

56(c).

**B.    Pottorf's § 1983 Claim**

Pottorf claims that Defendants fired her in retaliation for her statement alleging police brutality by Davidson, made privately in a Professional Standards investigation interview. It is well-established that "a state may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Hall v. Mo. Highway & Transp. Comm'n*, 235 F.3d 1065, 1068 (8th Cir. 2000); *see also Garcetti v. Ceballos*, 126 S. Ct. 1951, 1955 (2006) ("[A] State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." (quoting *Connick v. Meyers*, 461 U.S. 138, 142 (1983))). Public employees do not give up all their First Amendment rights: "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti*, 126 S. Ct. at 1957 (citing *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)). But, people must necessarily accept some limitations to their freedom when they enter government service because "[g]overnment employers, like private employers, need a significant degree of control over employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Id*. at 1958 (citing *Waters v. Churchill*, 511 U.S. 661, 671 (1994); *Connick*, 461 U.S. at 143).

Thus, courts apply the two-part *Pickering* test to determine whether a public employee's speech is constitutionally protected. *See Bradley v. James*, 479 F.3d 536, 538 (8th Cir. 2007). "First, did the employee speak as a citizen on a matter of public concern?

12

If the answer to that question is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id*. If the employee did speak as a citizen on a matter of public concern, the court must determine "whether the government employer had an adequate justification for treating the employee differently from any other member of the general public." *Id*. at 538 n.2.

### 1. *Pottorf Did Not Speak as a Citizen.*

The test for whether or not a government employee spoke as a citizen comes down to whether the speech was made "pursuant to official responsibilities." *Id*. at 538 (citing *Garcetti*, 126 S. Ct. at 1961). In *Garcetti*, a deputy district attorney alleged he was fired for writing a memo in which he recommended a case be dismissed based on purported government misconduct. The Supreme Court dismissed the argument that the deputy district attorney was acting as a citizen when he wrote his memo, instead finding it was written pursuant to his official duties. *See Garcetti*, 126 S. Ct. at 1960. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id*.

In this case, Pottorf attempts to avoid summary judgment by stating that nowhere in the Department's policy does it state that being interviewed in Professional Standards investigations is part of her official duties and responsibilities. As a result, her argument goes, she was not required to participate, and when she did participate, her statements were necessarily made as a private citizen. While it is true that the policy does not explicitly state

13

that communications officers are required to participate in Professional Standards investigations, it does state that the list is not exclusive and that "[s]pecifications are <u>not</u> intended to reflect all duties performed within the job." In fact, her argument that participating in Professional Standards investigations is contrary to her own admissions and actions. Pottorf admits that "[a]n employee's failure to give a statement in a Professional Standards investigation is a direct violation of the department's policy and can result in termination." [Doc. # 30, ¶26, at 3]. Moreover, Pottorf admits that prior to making her allegations against Davidson, she signed a document stating she was ordered by Balzer to give her statement "as a condition of employment." Pottorf also admits that when she specifically asked if she was required to answer Balzer's questions, she was told yes.

The facts of the current case are not too dissimilar to *Bradley v. James*. There, an officer with the University of Central Arkansas Police Department failed to respond to an emergency call while six other officers did. *Bradley*, 479 F.3d at 537. The police chief was called at home about the emergency and returned to the police station, where he asked the officer why he had not responded. *Id*. Unsatisfied with the officer's explanation, the police chief ordered an investigation into the officer's failure to respond. *Id*. As part of that investigation, during an interview the officer alleged that the police chief had arrived on the emergency scene intoxicated and had disrupted the investigation. *Id*. At the conclusion of the investigation, the officer was sent a letter stating that his failure to respond, as well as his "unsubstantiated comments" about the police chief were both terminable offenses. *Id*. Eventually the officer was sent a second letter terminating his employment, but listing only

14

"deliberate or gross neglect of duty" as the reason.

The Eighth Circuit held that the police officer had an official responsibility to cooperate in the internal investigation, and that his allegations of the police chief's intoxication were made at no other time than during the investigation; "thus, his speech was pursuant to his official and professional duties." *Id.* at 538. Pottorf attempts to distinguish *Bradley*, stating she was not a commissioned police officer. However, that is not the test *Bradley* applied. Pottorf, as a member of the Liberty Police Department, had a duty and obligation to participate in its internal investigations, which were not just limited to commissioned police officers but were instituted for the benefit of the entire Department and to ensure employees abide by the Department's policy and procedure. She was well-informed prior to making her statement that participating in the investigation was a condition of her employment, even signing a document acknowledging this fact. At no time did she object to it as outside her duties. Moreover, like in *Bradley*, Pottorf's allegations against Davidson were made at no other time than during the Professional Standards investigation.

Pottorf argues *Lindsey v. City of Orrick*, 491 F.3d 892 (8th Cir. 2007), should control this case. There, a city public works director made statements about sunshine law compliance at a city council meeting he was required to attend as part of his job. *Id.* at 898. The Eighth Circuit explained that the public works director's duties included park, water, sewer and street maintenance; there was no evidence that his job duties included sunshine law compliance. *Id.* Also, the public works director was specifically told that sunshine laws "were none of his business." *Id.* at 896. This is contrary to the facts of the present case,

15

where Pottorf duties and responsibilities did include participating in investigations, and those expectations were made expressly clear to her.

The Department depends on conducting its Professional Standards investigations to ensure its efficiency and effectiveness, and Pottorf's participation–when required–was part of the tasks she was paid to perform as a government employee. *See Garcetti*, 126 S. Ct. at 1960 ("When a public employee speaks pursuant to employment responsibilities, however, there is no relevant analogue to speech by citizens who are not government employees."). The restrictions on Pottorf's speech as a government employee "simply reflect[] the exercise of employer control over what the employer itself has commissioned or created." *See id*. Thus, this Court concludes Pottorf's speech was pursuant to her official and professional duties, and that she was not speaking as a citizen. Defendants' motion for summary judgment is granted.

### 2. *Pottorf's Speech Was Not a Matter of Public Concern.*

The Court's finding that Pottorf made her comments while acting as a public employee disposes of this case. That issue aside, the facts, in the light most favorable to Pottorf, do not show that her comments regarding potential police abuse were a matter of public concern. "'Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context' of the speech, and that speech must relate to some 'matter of political, social or other concern to the community.'" *Buazard v. Meridith*, 172 F.3d 546, 548 (8th Cir. 1999) (quoting *Connick*, 461 U.S. at 146-67).

While the subject of police brutality could generally be considered a matter of public

16

concern, *see e.g. Sexton v. Martin*, 210 F.3d 905, 910-11 (8th Cir. 2000) (officers who voluntarily made public information that public official was engaging in illegal conduct spoke on matter of public concern), this Court must focus on Pottorf's role in conveying the speech rather than the public's interest in the speech's topic. *See Bausworth v. Hazelwood Sch. Dist.*, 986 F.2d 1197, 1198 (8th Cir. 1993). "It is not enough that the topic of an employee's speech is one in which the public might have an interest. We must determine whether the purpose of the speech was to raise issues of public concern or to further the employee's private interest." *Sparr v. Ward*, 306 F.3d 589, 594 (8th Cir. 2002) (citation omitted). In *Buazard*, the Eighth Circuit explained that although the incident which led to the firings of two police officers may have been a matter of public concern, the public employee's statements concerning the firings were made at the request of the police chief. *See Buazard*, 172 F.3d at 548. The court further held there was no indication that the public employee, in making his statements regarding the police officer firings, "was taking any action as a concerned citizen, rather than simply as an employee following orders or refusing to follow them." *Id*. at 548-49. The employer's resulting actions against the public employee were in his role as a public employee, and not a violation of his First Amendment rights. *Id*. at 549.

Here, just like in *Buazard*, Pottorf's statements were made at the request of her employer. In the eight years since the incident allegedly happened, Pottorf never raised or discussed it with anyone before being asked during an investigation, and then only because she was told she had to answer the question. There are no facts indicating that when Pottorf

17

made her comments, she was speaking as a concerned citizen; to the contrary, because she was told that participating in the Professional Standards investigation was a condition of her employment, and that she reluctantly divulged the information only after asking if she was required to answer, the facts show Pottorf made her statements primarily to further her private interests.

Also, it is relevant to this analysis that Pottorf's statements were entirely internal to the Professional Standards investigation. "A public employee does not necessarily give up his right to free speech, and the protection of the First Amendment, simply because his speech is private, and not expressed in public." *Id.* (citing *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 414 (1979)); *see also Belk v. City of Eldon*, 228 F.3d 872, 879-80 (8th Cir. 2000). Still, the internal nature of the speech is a factor to be considered. *See Buazard*, 172 F.3d at 549. Thus, taken together the internal nature of Pottorf's comments and Pottorf's role as employee in making the statements leads this Court to conclude that the speech was not a matter of public concern. *See id.*

## IV. Conclusion

Because Pottorf's speech was not protected under the First Amendment, and that issue is dispositive, this Court does not reach the questions of municipal liability and qualified immunity.

18

Accordingly, it is hereby

ORDERED that Defendants City of Liberty, Missouri, and Craig L. Knouse's Motion for Summary Judgment [Doc. #26] is GRANTED.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

19

Dated:  September 24, 2007
Jefferson City, Missouri